DELAWARE TRUST COMPANY, a corporation of the State of Delaware, Executor under the Will of DEBORAH MORRISON ROOD, deceased,
*Plaintiff,*

*vs.*

DEBORAH ROOD EVERITT and ROBERT HOWE EVERITT, sometimes known as ROBERT EVERITT HOWE,
Defendants.

*New Castle, April 3, 1958.*

*On Application for Costs and Attorneys' Fees*
*May 2, 1958.*

*On Application for Costs and Attorney's Fees*

*David F. Anderson* (of Berl, Potter & Anderson), Wilmington, for plaintiff.

*Henry M. Canby* and *Max S. Bell, Jr.,* of Richards, Layton & Finger, Wilmington, for defendant Deborah Rood Everitt.

*Arthur G. Logan* and *Vincent A. Theisen,* of Logan, Marvel, Boggs & Theisen, Wilmington, for defendant Robert Howe Everitt.

SEITZ, Chancellor: This is an interpleader action instituted by the Delaware Trust Company, executor under the will of Deborah Morrison Rood. The real claimants are the defendant, Deborah Rood Everitt ("Deborah"), the daughter of the testatrix and Robert Howe Everitt ("Robert"), Deborah's former husband. Deborah claims as assignee from Robert certain stock which formed part of a legacy left him by his former mother-in-law. Robert denies that the assignment was absolute. This is the decision after final hearing.

Deborah and Robert were married in 1943, at which time Robert was working in Mexico City. Some time after this marriage Robert acquired an automobile finance company and an automobile parts business in Mexico City. It became necessary for Robert, in the operation of the finance company, to maintain certain gold reserves. Through an arrangement with the Banking Commissioner, the gold reserve requirement was waived with the understanding that when the company was examined, evidence of a deposit in an amount sufficient to satisfy the requirement would be produced.

On January 9, 1952, anticipating a government inspection of the finance company, Robert telephoned his wife, told her of his position, and requested that she make the necessary money available for the reserve. She immediately telephoned the Delaware Trust Company in Wilmington, arranged to have 400 shares of Hercules Powder Company stock, belonging to her and on deposit at the Bank, used as collateral for a loan of $13,500 from the Bank to her. This sum was deposited to the account of Robert the same day. Deborah later executed a demand note in favor of the Bank. At the time the loan was made by Deborah to Robert, apparently it was understood that the money would only be needed for a short time, but time went by without repayment.

Deborah Morrison Rood died testate on March 20, 1953, survived, *inter alia,* by her daughter, Deborah, who was married to Robert. Delaware Trust Company was named as executor. Item Fifth of said will created the legacy in Robert's favor. It is a portion of the subject matter (being Hercules Powder common stock) of this legacy which is here in dispute. It provides:

> *"Fifth: I* give and bequeath three per cent (3%) of my estate remaining after the provisions of Items First, Second, Third, and Fourth hereof, unto my son-in-law, Robert Howe Everitt, if he is living at the time of my death and if he does not die within a period of thirty (30) days from and after my death, and I authorize my Executor to assign, transfer, and pay over said bequest, absolutely and in fee simple, unto my said son-in-law in cash or in securities or partly in cash and partly in securities to be selected by my said son-in-law."

During the 1952-53 period Deborah appears to have been acquiring an ever increasing interest in the affairs of a Mexican horse-racing track, known as the Hippodrome de las Americas. Her efforts in this regard culminated in an agreement in July, 1953, whereby she obtained practical working control in return for the overall sum of $500,000 (70% in cash, 20% by her father's note and 10% from earnings).

The loan which Deborah had made to Robert remained unpaid, at least until May 10, 1953. By this time Mrs. Rood had died. Robert, having found that he did not need the $13,500 for purposes of the inspection, had applied it to increase the stock of his automotive parts business. At this time (May 10, 1953), Deborah was preparing to leave for Wilmington for conferences with Delaware Trust Company officials; she being an Advisor under her mother's will.

Immediately prior to her departure for Wilmington and for reasons hereinafter discussed, Deborah requested Robert to repay the loan. Robert prepared, signed and delivered to her two letters, both dated May 10, 1953. One of them, which for identification purposes I shall refer to as the "assignment" letter, is the document upon which Deborah seeks to prevail in her claim of an absolute assignment of so much of Robert's interest in the estate as was necessary to repay the loan. It reads:

May 10, 1953

"Dear Mr. Lovett:

"Please consider this letter your authorization by me to assign to my wife, Deborah Rood Everitt, sufficient of the stock inherited by the undersigned from the estate of Deborah Morrison Rood to cover a loan for $13,500.00 (Thirteen Thousand Five Hundred Dollars).

"Many thanks to you for your attention to this request."

The second letter of the same date, hereafter called the "pledge" letter, is the one which Robert contends reflects the true intent of the parties when read with the so-called assignment letter. It is as follows:

May 10, 1953

"Dear Mr. Lovett:

"This will authorize you to use sufficient of the stock inherited by the undersigned from the estate of Deborah Morrison

Rood, for loan purposes to cover a loan in the amount of $13,-500.00 (Thirteen Thausand Five Hundred Dollars).

"Deborah Rood Everitt is authorized by me to handle such a loan with your bank."

Deborah maintains that Robert agreed to repay by making an absolute assignment of so much of his legacy as was necessary to cover the loan and that his action is evidenced by the assignment letter. Robert contends that the letters were to authorize the Bank's use of his legacy to serve as collateral for a loan of $13,500 to Deboraoh.

Just when the assignment letter was actually delivered to the Bank is a matter of dispute. Deborah contends that the assignment letter was left with Mr. Lovett of the Bank in May 1953. He had no recollection concerning the matter. The letter bears the Bank's stamp of January 1954. As hereinafter noted, I am not persuaded that the assignment letter was left with the Bank when Deborah visited it in May 1953.

On January 17 and January 18, 1954, Deborah and Robert executed what may be called separation agreements by which, *inter alia,* they released each other from any financial claim against the other. The second of these agreements called the "Arce" agreement was a part of their property settlement. It was made a part of their Mexican divorce decree entered in 1954. Deborah tacitly concedes that these settlement agreements wiped out Robert's loan obligation to her if it had not theretofore been paid by virtue of an absolute assignment of a portion of his legacy to her.

The parties made conflicting claims on the executor with respect to the ownership of the legacy stock. This interpleader action resulted.

This court must determine whether the so-called assignment letter of May 10, 1953, was intended by Robert to constitute an absolute assignment in payment of his indebtedness to Deborah or only as a right given her to pledge so much of his legacy in the form of stock as was necessary to cover a loan for $13,500.

The parties do not dispute the general principles of law applicable to this case. Nor is it controverted on the record that if Robert made an absolute assignment to Deborah, her claim must now be honored by the executor. But I must dispose of one preliminary matter. Robert's counsel seem to argue that there was no assignment at all. I think this is an imprecise formulation of the issue. There was an assignment and the issue, as I view it, is whether the assignment was absolute or only for security purposes.

Since Deborah, to prevail, must show an absolute assignment from Robert, I take it she has the burden in that regard. See *Johnson v. Vickers,* 139 *Wis.* 145, 120 *N.W.* 837, 21 *L.R.A.,N.S.,* 359; 4 *Am.Jur., Assignments,* § 128.

I turn first to an examination of the language of the assignment and pledge letters of May 10, 1953.

The pledge letter rather clearly indicates that Robert was assigning to Deborah sufficient stock (to which he was entitled as legatee) to secure a loan for $13,500 by Deborah from the Bank. But Deborah claims this letter was superseded by the so-called assignment letter of the same date. The assignment letter was in effect an assignment by Robert to Deborah of sufficient stock from his legacy "to cover a loan for $13,500". The quoted language is ambiguous. Was it intended that Deborah was to receive the stock to secure a prior loan? Was it intended that such stock was to be used to secure a loan by Deborah from the Bank? Was it to satisfy the prior loan?

Standing alone, the so-called assignment letter is too ambiguous to support the finding of an absolute assignment. Certainly the Bank could not have safely acted on the basis of the letter.

When the assignment letter is read in conjunction with the so-called pledge letter of the same date, there is even less reason to conclude that an absolute assignment was intended. Indeed, it may be noted that in neither letter did Robert assign stock equivalent to the amount which he owed Deborah. Rather, in each letter, he assigned

"sufficient of the stock * * * to cover a loan". Clearly this could mean more than $13,500 worth of the stock was to be used if necessary as collateral for a loan in that amount. Such language is inconsistent with an intention to repay the loan.

We now turn to the surrounding circumstances to see whether they assist in arriving at the proper construction of the assignment letter.

The circumstances giving rise to the preparation of the assignment letter are in dispute. Deborah says the pledge letter was first given to her by Robert when she asked for repayment of the loan; that upon reading it she found it unsatisfactory and immediately asked Robert to execute the so-called assignment letter, which he did. He disputes plaintiff's assertion that either one was anything more than an attempt to make collateral available to her. He says he was making a gesture of aid to Deborah in her efforts to acquire controlling interest in the race track, since she had done the same for him earlier. Deborah, on the other hand, contends she needed no collateral from Robert in order to finance the purchase of the track and that the May 10 letters were prepared to effect repayment of the $13,500 debt. In support of her contention she points to the following facts:

1. The deal for the rack track was not consummated until July 19, 1953, so there was no need to amass capital in May, 1953.

2. Robert's collateral was hardly "a drop in the bucket" compared with the purchase price ($500,000) of the track.

3. No commercial bank would have lent the money on this type of collateral, viz., an interest in an estate.

4. She actually financed the deal without touching her own legacy, and of course, without utilizing Robert's.

Let us consider these contentions in order.

By Deborah's own admission she was "trying very hard to make the deal" for the race track on May 10, 1953, just as she had been throughout the first half of 1953. Indeed, on the date of the alleged assignment and thereafter until the latter part of the month of June, 1953, she had not assembled the necessary financial backing to effect the purchase. It is clear that her efforts in this regard began considerably earlier than the date upon which the sale was consummated.

It is true that $13,500 was small in comparison to the cash amount ultimately needed to effect the purchase ($350,000). However, in view of the way Deborah was attempting to raise the money at that time I believe she would have considered a loan of such amount as an aid toward her goal. I say this because the evidence demonstrates that Deborah had previously solicited the aid of others to provide the $100,000 necessary to render the purchase agreement binding until financial arrangements were worked out. In view of the fact that the record discloses that she contemplated the use of capital principally supplied by others to complete the purchase of the track, it is not unlikely that she would have approached her husband for such help as he might give.

Nor am I persuaded that the loan offer was so limited in amount as to compel a finding that the parties did not consider it for that purpose. It does not appear that the purchase negotiations were carried on in any manner obliging Deborah to amass a large amount of cash until after the date of the alleged assignment. By her own testimony, prior to the end of June, 1953, her efforts were channeled toward effecting the purchase through an arrangement whereby the major part of the purchase price required, in addition to the $100,000 deposit, was to be paid from the track earnings. Surely, this plan would not have necessitated amassing so large an amount as the $350,000 figure ultimately fixed. Thus, in May, 1953, Robert's $13,500 offer would have been a significant item in connection with the purchase on the terms then contemplated.

The record affirmatively establishes that Robert had no knowledge of the size of his mother-in-law's estate, or the amount or nature of his legacy at the time the assignment letter was written. Indeed, it

appears that the first information available to either party in this regard was given by the Bank to Deborah on her May 12, 1953, trip to Wilmington. Hence, the contention of Deborah that no commercial bank would have allowed Robert's interest to serve as collateral for a $13,500 loan is of no significance in the absence of a showing that he was possessed of such knowledge at the time he executed the letter.

Finally, the fact that Deborah was actually able to finance the purchase without using her own assets or Robert's legacy does not prove that she had no desire to use his stock as collateral for a loan of $13,500 on May 10, 1953. It is not controverted on the record that Deborah's father, Mr. Norman P. Rood, had not at that time agreed to assist her in this track venture.

I am convinced that Deborah failed to prove that on May 10, 1953, she had no reason to seek the use of Robert's collateral to secure a loan to aid in the purchase of the race track.

Certain conduct of the parties subsequent to May 10, 1953, must also be considered in order to arrive at a proper construction of the assignment letter. Incidentally, both parties agree that for Deborah to prevail in this action, such conduct must show that the parties considered the assignment letter an absolute transfer of Robert's interest to Deborah whereby she had the right to realize thereon without further action on his part.

Deborah maintains that her letter of January 9, 1954, written to Mr. Lovett, an officer of the Delaware Trust Company, is proof that she regarded the assignment letter as an effective transfer of Robert's interest in payment of the earlier loan. It is important to a proper evaluation of this contention that I first consider the contents of this letter in light of Deborah's testimony. The pertinent portion of her letter follows:

"I enclose a letter to you from Bob [Robert] regarding my loan of $13,500 which you deposited to Bob's account at Delaware Trust on January 9, 1952. It is self-explanatory to the effect

that he wishes all and any amounts coming to him from the Deborah M. Rood estate, to be credited against this loan until fully paid and then such balance as there may be deposited to his personal account at Delaware Trust."

It is Deborah's contention that the enclosed letter of Robert's was not the assignment letter of May 10, but was written by Robert at her solicitation for the purpose of reiterating his desire to make an absolute assignment. In view of the fact that the enclosed letter was not produced in this action, and because the assignment letter is stamped as having been received by the Bank on January 13, 1954, I am compelled to conclude that Deborah's contention here is not factual. I believe the enclosure was Robert's assignment letter.

Even if Deborah's testimony is true, such conduct on her part, in sending a letter in addition to the assignment letter (which she maintains was in the Bank's possession from May, 1953) is, to a degree, inconsistent with her argument that she regarded the assignment letter as sufficiently effective to enable her to realize on Robert's legacy interest without further action on his part. Indeed, even Deborah's language in her letter of January 9, describing Robert's letter, leaves the legal nature thereof in serious doubt.

Mr. Lovett's reply to Deborah, in which he acknowledged possession of the letter signed by Robert "relative to the use of his interest * * * as protection for your loan of $13,500", and Deborah's inaction in the face of such characterization, is further evidence that she did not consider the assignment absolute.

In its ordinary meaning, the use of a thing does not imply the acquisition of title thereto. *Smith v. Smith*, 359 *Mo*. 44, 220 *S.W.2d* 10; *McAllister v. Long*, 206 *Okl*. 623, 246 *P.2d* 352, 354. The term "protection" in the circumstances is synonymous with the word "security". It is true that Lovett's reply stated his opinion, apparently based upon advice of counsel, that the will excluded an assignment. However, Deborah's inaction is not explained by that fact since she testified that she was never persuaded that his interpre-

tation of the will was correct until September 1954 (an interpretation which was incorrect). Her inaction then is consistent with the view that she regarded the Bank's "protection" characterization as proper. In any event, I believe the ambiguity must be resolved by interpretating Deborah's letter as her understanding that the assignment letter authorized the Bank to employ Robert's legacy as security for a loan. Even if she considered it as security for her earlier loan, she is no better off.

Deborah relies upon her letter of September 21, 1954, to Mr. Lovett, in which she refers to the assignment letter as the Bank's authority to deduct $13,500 from Robert's inheritance when it was ready to make payment of the same to him. She contends that it shows that insofar as the language impliedly asserts that the Bank is to pay over the withheld amount to Deborah or for her benefit, it is consistent with an understanding on her part that the assignment letter gave rise to an absolute transfer. However, the language is equally susceptible to a construction which would sound in pledge rather than absolute assignment.

There are other instances when Deborah's inaction, in face of the Bank's reply, becomes significant. On October 1, 1954, Lovett wrote to Deborah, acknowledging receipt of her letter of September 21 and stating that:

> "Your letter as well as our telephone conversation gives me the understanding that if he [Robert] pays the $13,500, you are satisfied".

It is clear that had Deborah regarded the assignment letter as an absolute transfer, no payment by Robert could have avoided it. But more important is the fact that despite the Bank's treatment of the assignment letter as one for security purposes, Deborah failed to protest or advise the Bank that it was obligated to turn the stock over to her. This is evidence that she acquiesced in the Bank's interpretation of her rights under the assignment letter. Of course we are interested in Robert's intention, but the foregoing discussion is relevant as an objective interpretation of the instrument by the one most interested.

It is further established on the record that long after the date of the alleged assignment, Robert made interest payments on Deborah's loan from the Delaware Trust Company of the $13,500 which she deposited to Robert's account. Such conduct, known to Deborah, tends to prove that as between these parties, they continued to regard the original loan as Robert's obligation. This conduct is inconsistent with any intention on Robert's part to make an absolute assignment of stock on May 10 in payment of his debt to Deborah.

Deborah explains Robert's interest payments by contending that there was an agreement between the parties whereby Robert obligated himself to pay interest on Deborah's loan with the Bank if she would get the $13,500 for him. She maintains that this agreement obligated Robert to continue such payments after the date of the assignment and until she was able to obtain the $13,500 from the estate; it appearing that the administration period on the estate had not expired on May 10, 1953. However, if this was Deborah's understanding of Robert's obligation, it is not reflected in her act, in February 1954, of consolidating the $13,500 loan with other loans that she had at the Delaware Trust Company. This was done some two months prior to the end of the year of administration.

It is significant that Deborah relies upon the assignment letter as the product of the parties agreement to effect repayment of Robert's debt to her. The receipt by a creditor of an order drawn by his debtor upon a third person for the delivery of money to the creditor, constitutes payment whenever the creditor agrees that ·it shall so operate. 70 *C.J.S. Payment* § 27, p. 239. The effect of payment is to extinguish a debt, *Leiter v. Carpenter*, 26 *Del.Ch.* 85, 22 *A.2d* 393; and the payment of the principal debt stops the running of interest. 47 *C.J.S. Interest* § 51.

I am convinced that the payments of interest by Robert long after the date of the alleged .assignment, were not made pursuant to an agreement of the parties. Deborah not only had knowledge concerning them but she also gave the Bank instructions as to their application and

the billing of Robert therefor. Such payments were inconsistent with Deborah's claim of an absolute assignment.

Finally, Deborah relies upon certain conduct by Robert to show that he originally intended an assignment. She first points to his letter of January 28, 1954, to her which she claims "refers to the May 10th letter as an assignment". The term "assignment" is there used by Robert in the same context as it was used in the assignment letter, viz., as collateral for a loan. I am therefore unable to find that it shows conduct inconsistent with the view which he now maintains.

In September, 1954, Robert twice visited with Mr. Lovett at the Delaware Trust Company in Wilmington. The details of what transpired are recorded in a seven page memo prepared by Mr. Lovett. But I am unable to find that the memo contains any record of Robert's conduct which would be inconsistent with his contention of an assignment to Deborah for security purposes only. On the contrary, the memo reveals that Robert insisted upon a settlement of his debt to Deborah in order that he might keep all of the stock due under the legacy. Surely, this course of conduct is consistent with the conclusion that he had not divested himself of rights thereto by executing the so-called assignment letter.

I conclude that the credible evidence fails to sustain Deborah's burden of proving an absolute assignment from Robert. Practical considerations prevent the mentioning of additional disputed matters. All have been resolved in a manner consistent with the conclusion here reached.

Deborah tacitly concedes that if Robert's letter of May 10, 1953, was not an absolute assignment her claim is without merit. Since I have so found, it follows that she has no claim to the shares here involved. Consequently, an order will be entered directing the delivery of the shares and dividends to Robert.

Present order on notice.

*On Applications for Costs and Attorneys' Fees*

Plaintiff, Delaware Trust Company, as executor, filed an inter-pleader action joining as defendants, Deborah Rood Everitt ("Deb-orah") and her former husband, Robert Howe Everitt ("Robert"). The basic issue was whether Robert had made an absolute or limited assignment to Deborah of a portion of his bequest under the will of which plaintiff was executor. By an opinion dated April 3, 1958, this court decided that the circumstances required plaintiff to file the action and that the assignment was limited and not absolute. The result was that the court instructed the executor to pay the portion of the bequest in question to Robert.

After the court's decision all parties applied for payment of their costs and attorneys' fees and this is the decision thereon.

I commence by rejecting Robert's contention that plaintiff's ap-plication cannot be viewed as one coming under the head of an executor seeking instructions for the proper administration of the estate. The executor was required to distribute the estate and was entitled to in-structions as to how a portion thereof was to be disbursed because a substantial doubt in that regard was created through no fault of plain-tiff.

I believe that plaintiff, whether viewed as a bona fide inter-pleading party or as executor seeking judicial instructions, is entitled to have its costs and attorney's fees paid from the fund. See *Globe Indemnity Co. v. Puget Sound Co.,* 2 Cir., 154 *F.2d* 249; 48 *A.L.R.2d* 190; *Maurer v. International Re-Insurance Corp.,* 33 *Del.Ch.* 456, 95 *A.2d* 827. Although there are cases holding to the contrary as to attorneys' fees in the interpleader field, e. g., *Pacific Gas & Electric Co. v. Nakano,* 12 *Cal.2d.* 711, 87 *P.2d* 700, 121 *A.L.R.* 417, I do not believe they should be followed.

Since, in my view, plaintiff was fully justified in filing the action, this is not a case where plaintiff should be denied its costs and at-torney's fee on the theory that it was actually involved in some phase

of the dispute. Compare 48 *A.L.R.2d.* at pages 214-215. Pleading-wise at least, plaintiff was kept in the action solely because of Deborah's claim (not tried, by agreement) that it was guilty of misconduct. This phase of the matter will not be considered in fixing plaintiff's costs and attorney's fee.

Our Supreme Court in Maurer v. International Re-Insurance Corp., above, by way of example, recognized plaintiff's interpleader costs (in an attorney's fee context) as being an exception to the rule against shifting the burden of paying attorneys' fees. However, the court did not consider the issue of the ultimate responsibility for such costs. The real question, then, is whether the allowance of plaintiff's costs and attorney's fees should ultimately be paid by the party whose claim has been adjudged groundless. The general rule seems to be that in such a case the unsuccessful claimant must ultimately bear such costs and expenses. See *Globe Indemnity Co. v. Puget Sound Co.,* above.

█ In Delaware we have a statute (10 *Del.C.* § 5106) which provides that "the Court of Chancery * * * shall make such order concerning costs in every case as is agreeable to equity". I assume that this includes attorneys' fees in an appropriate case. See *Perrine v. Pennroad Corp.,* 30 *Del.Ch.* 517, 64 *A.2d* 412; but see *in re Dougherty's Will, Del. Orphans' Ct.,* 10 *Terry* 273, 114 *A.2d* 661.

█ Passing over the attorneys' fee problem for the moment and considering only plaintiff's costs, I am satisfied that our statute, which incorporates the established discretionary equity rule, permits the court to consider factors not necessarily relevant to the merits of the principal controversy. Compare *Bodley v. Jones,* 30 *Del.Ch.* 592, 65 *A.2d* 484.

█ In my view, the equitable approach here is not to place the ultimate responsibility for the payment of plaintiff's costs upon the losing claimant, Deborah, but upon the fund, which means upon Robert. I so conclude because of the special circumstance that Robert executed the ambiguous documents, and it was their existence which

required plaintiff to incur in good faith the costs now sought to be collected. Plaintiff will be allowed costs in the sum of $58. I have omitted the $25 deposit made by plaintiff to commence the action because that will be returned to plaintiff when the court costs are paid by the parties against whom they are assessed.

The next question is whether an unsuccessful claimant must bear the ultimate responsibility for the payment of plaintiff's attorney's fees. There are few cases dealing with the attorney's fee aspect of this problem. In at least one case the unsuccessful claimant was required to make such payment. See *Globe Indemnity Co. v. Puget Sound Co.,* above; compare *Richards v. Salter, 6 Johns.Ch., N.Y.,* 445.

Deborah's counsel argues that since the dispute had its inception in the issuance of the ambiguous documents by the successful claimant, the fees should be assessed only against the property, and thus against Robert. In determining whether or not the payment should ultimately be made by the unsuccessful claimant, is this court free to consider the fact that the successful party's action necessitated the filing of this case?

In *Globe Indemnity Co. v. Puget Sound Co.,* above, in assessing plaintiff's attorney's fee ultimately against the unsuccessful claimant, the court recognized that the decision involved the exercise of sound discretion. I adopt this approach because the court is involved in an area where the equities of each particular case may be considered.

When the equities are considered here, particularly the fact that Robert wrote and delivered the ambiguous assignments to Deborah, I am persuaded that the property involved, and thus Robert, should bear plaintiff's attorney's fee. I so conclude. If desired, counsel will be heard on the reasonableness of the application.

A petition has been filed by Deborah, the unsuccessful claimant, asking that her costs, including an attorney's fee, be paid from the property in dispute. This is not the ordinary case where the executor's need for instructions arises from a situation not created

by the party seeking payment of his costs and attorney's fee. I cannot see any basis for allowing the unsuccessful party any attorney's fee or costs from the fund. In any event, the questionableness of some of her actions in connection with this transaction would not appeal to the court even if the matter were to be viewed as one falling within the sound discretion of the court.

Deborah's petition for costs and attorney's fee will be dismissed.

■ Finally, I consider Robert's petition asking that his costs and attorney's fees be assessed against Deborah. Assuming without deciding that in the exercise of sound discretion this court can require the unsuccessful claimant to pay the costs and attorney's fee of the successful claimant, I do not believe that discretion should be exercised affirmatively here. I say this primarily because Robert's actions in writing and delivering the ambiguous assignments necessitated the bringing of this action by the executor. He should therefore pay his own costs and expenses. His petition will also be denied.

■ I believe that the court costs should be equally divided between the two claimants under the circumstances of this case.

Present order on notice.